Case number 16-1342, ESI Energy, LLC petitioner v. Federal Energy Regulatory Commission. Professor Eisenstadt for the petitioner, Mr. Gladd for the respondent, and Mr. Parrish for the intervener. Good morning. My name is Larry Eisenstadt from Crowell and Mooring on behalf of petitioner ESI Energy. May it please the Court, I'd like to reserve two minutes of my time for rebuttal. When this dispute first appeared before the Court, you instructed FERC to address the many shortcomings of the Commission's initial orders. You did not prescribe an outcome. On remand, the Commission simply did not do its job. In fact, to a very great extent, the Commission thought that the Court had already done its job for the Commission. The Court asked the Commission to explain the significance of the PJM filing, the AMP Ohio motion for request for clarification, PJM's acceptance, and how it all related to the letter order. Marcus Hook provided that explanation. On remand, we showed that PJM clearly proposed to grandfather interconnection customers in queues that closed prior to the U2 queue. That is undisputed. We showed that PJM clearly reiterated that proposal when it responded to a specific request by AMP Ohio. No objections at the time were made to PJM's response, not even from LS Power Associates. That was not only a party in the Dominion case, but a signatory to the settlement agreement that resulted in the Dominion proceeding, that resulted in the tariff sheet filings in this case. We showed that FERC accepted the tariff sheets. That's the letter order. They accepted the tariff sheets as proposed. There were no objections from anybody, any market participant, as to what FERC meant in its order. Everybody in the industry understood exactly what FERC meant in its order. Certainly PJM understood it, and certainly PJM continually reiterated that to West Deptford every time they talked about cost allocation, every time there was a study, and indeed there was in fact a facility study agreement. That agreement was not simply about the cost of the study. That agreement specifically said that the cost responsibility would be determined pursuant to section 37.7. Now... I think it said estimates. Estimates shall be consistent with section 37 or section 42. That's correct, Judge. What was section 42? I'm sorry? What was section 42? I really don't know the answer to that question. It says consistent with section 37 or 42, so I'm trying to read all the language to understand your argument. I'd have to look up what 42 is, but I'm sure at one point in time I knew, and it's irrelevant to this issue. But perhaps if it is relevant, it will be brought up. It does say section 37. Pardon me? It doesn't say 37.7. Well, 37. Consistent with section 37. And 37 is in fact what we are talking about here. We're talking about its applicability to West Deptford. Whether or not you focus... The important thing is there's nothing that says it would be binding on West Deptford. That's correct, Your Honor. So I mean, it's there, and it says the estimates have to be consistent with it. That's very different from saying it's binding on West Deptford. That's absolutely true. But what was binding on West Deptford was its agreement that the estimates would be prepared pursuant to 37. So whether West Deptford, you know, agreed to pay those costs is quite immaterial. At a minimum, it shows that West Deptford was on actual notice. It says indeed it's already acknowledged in this proceeding that it was on actual notice as to the intent to allocate costs to it. But isn't that so, as you just said, your view is it doesn't matter what they viewed the proper charge to be. You said it was one side's, BJM's, intent that was reflected in that agreement. At least our prior decision was clear that one-sided statements of intent aren't going to comply with the statutory obligation to have tariff terms, open, public, available notice, agreed upon tariff terms. We're not suggesting that the facility study agreement in itself proves up the tariff. We're just suggesting that that agreement proves up the fact that at all pertinent times, that West Deptford knew that BJM intended to charge it pursuant to 37. Whether it was bound at that time, that's what I'm saying is immaterial. So you say as a matter of law, the only notice they need to have to have an exception to the backdrop rule of governing tariff applying, the only notice they need to have is that one party intends to charge them. No, I'm sorry. That's the way it's coming across, which makes no sense. Okay. First, let's talk about the notice. First of all, they had notice by the order itself. The letter order wraps everything together. The court asks for an explanation. Well, how does this all work together, clear it up for us? All right. Well, the fact of the matter is that what the letter order, and I might add that the letter order really wasn't discussed. Tell me what you mean by the letter order. The letter order is, I'm sorry. The letter order is the order that accepts the tariff sheets as proposed. That's what I'm referring to as the letter order. The letter order, if I may call it that, really doesn't come up in Ferg's brief in West Deptford. It didn't come up below that much either. And it's curious because that's a statement, an order from the commission that it's approving the tariff sheets. Now, what it says in that order, it's important to look at that order in context. What it says in that order is, okay, here's all the stuff that's been proposed. And it cites the AMP Ohio clarification in the first paragraph, if you will, of that letter order. Where is this letter order in the record? Sure. It's Joint Appendix 399. So if you look at the first page of 399, you'll see that the first paragraph says, the revisions include, in other words, in the first sentence it says, you made a filing of these revised tariff sheets in compliance with the commission's order, which required you to develop new procedures. These revisions include modifications to the procedures for cluster, et cetera, et cetera, procedures for studies of primary and secondary points of interconnection, and the cost allocation between queues. In response to AMP Ohio's request for clarification, PJM clarified that the modification regarding cost allocation will occur only for those upgrades, et cetera, et cetera, and will be applied to the U2 queue effective August 1, 2008. So that's the first paragraph. Now, when you look at the next paragraph, all right, so they talked about this is what the filing is. Here are the revisions. And the next paragraph says the filing was noticed, various comments. They refer to AMP Ohio again. They filed a request for clarification. And PJM filed its answer. And there were notices. Nothing was opposed. And then ultimately they accept the tariff sheets as proposed. In other words, as proposed in conjunction with the PJM answer. That's why they talk about AMP Ohio. And I might add that to the extent, it's also important to know that nothing was changed with respect to the how you did the cluster studies with respect to facilities. Nothing was changed with respect to how you did the studies with respect to facilities over $5 million. That's why it wasn't a revision. They changed the number. But it wasn't a revision when you look at the transmittal letter, for example. And PJM clearly says that in the transmittal letter. The only revision was to how they did it for facilities under $5 million. They did what's called a clustering. And the specifics aren't important. I'm happy to do the difference. So the only revision had to do with the smaller facilities. And the larger facilities, the procedures were left unchanged. So what the letter order ultimately does, it takes the answer. It takes the fact that no objections were raised. It takes the fact that all the parties in the settlement agreement were there. That was the case that resolved the settlement agreement, if you will. It takes all that information, and it says on the basis of all that information, we approve. And no one had a problem with it at the time. You've already said that that language was not clear. And it went back to the agency. You're arguing as if it's just absolutely clear that West Duffer was bound, despite the fact that their filing was still pending when the tariff was changed in 2011. Do you mean their interconnection service agreement, Judge? Right. The court absolutely, and we're not questioning the court's challenges at all with respect to the ambiguities in the material that was presented to it. The fact is, though, that the letter order wasn't clearly presented at all. And when we presented it in context, then it becomes quite clear what was meant and what was said. Not just what was meant, what was said. We're not challenging the ambiguity in any one particular document, although personally we are of the view that participants in the industry clearly knew what was going on. You know, there was a reason why LS Power was in that proceeding. The reason was because it was protecting its facilities, like its generating plants, like West Duffer. That's what it was doing there. And indeed, if you look at the settlement agreement, and we're happy to provide it to the court, if you look at the settlement agreement, it specifically mentions Q90. Q90 was West Duffer. It was in the settlement agreement. Are there any FERC decisions or cases of this court saying that letters like this are legally binding interpretations of the tariff? Yeah, there are. Well, the answer is... This has legal consequence independent of the tariff itself. Independent of the tariff itself. Two points, if I may. First of all, when you first heard the case, there was an agreement... Not agreement. There was a statement that for purposes of this case, it was agreed by the commission in West Duffer, and you accepted that in terms of this particular case, that the transmittal letter itself could be incorporated into the tariff, and it satisfied all but the plain statement requirements of the filed rate doctrine. So that was the law of this case. That was the finding of this case, that for that purpose, the transmittal letter was pertinent merely to whether there was a plain statement. And with respect to whether there was a plain statement, there are cases that pertain. One is Old Dominion, 518F343 at 4849, indicating that FERC may look at extrinsic evidence in interpreting ambiguous tariff provision. Another one, Entergy Services at 568F3978, says FERC may look at extrinsic evidence including subsequent course of performance in interpreting ambiguities. So there are cases. I could be happy to provide you with a number of other citations. I think we'll hear from the other side now, but we'll give you some time for rebuttal. Thank you. Good morning. May it please the Court, Nicholas Gladd for the Commission. There's been a lot said about the letter order. I think I'd like to start there, if I might. I think Judge Edwards hit the nail on the head in noting that this Court clearly found the transmittal letter to be ambiguous the first time around. And even if you assume arguendo that Petitioner's argument here is right, that this acceptance as proposed incorporated these other documents and the language in them, that assumes that those other documents were clear, and the Court the first time around found each of those documents unclear. The Commission agreed this time around, so I don't think you can say that that as proposed language does the work that Petitioner's claim it does here. I think it's more accurate to say that it just indicates that August 1, 2008 was the effective date and that that's the one that was in the filing, and it's not some other date that the Commission was setting. It came from the filing itself. Does the Commission have a position on the legal consequence of letters like this? The legal consequence of a letter order like this? It has the same legal consequence as a Commission order. Are you referring to specifically the as proposed language of the letter order? Because the next page of the letter talks about this acceptance for filing shall not be construed as constituting approval of the reference filing, da-da-da-da-da. So I'm trying to figure out how you understand this, apart from the prior case in this case. Just as a matter of law, how do you understand a letter like this? That paragraph in the letter order is boilerplate in all of these letter orders, and it just indicates that because there was limited litigation in the proceeding, there were no protests filed, there were no comments going to certain issues, that the Commission wasn't necessarily endorsing all of the positions that may flow from the order. It's just saying the filing was given to us with this effective date. The issues weren't raised, so we're accepting it with that effective date. And as to the paragraph lower down on that first page that my friend on the other side highlighted, that language that he pointed to, the reference to the August 1, 2008 Q2 cue, merely highlights the problem with the letter order as the Court found it the first time around. It doesn't say anything about earlier cues. I'm just saying that it's effective August 1, 2008 coinciding with that cue doesn't say anything, by its own terms, about the earlier cue that West Eppard was in. I would like to... Can you talk about that facility studies agreement and all those things? Are they, sorry, was that one of the listed things? Was that filed with the... Are all these studies and studies agreements always filed with the Commission as part of the tariff itself, or they tend to be just between the parties? They're just between the parties until the interconnection agreement is filed. My understanding is that they are attached to the interconnection agreement in most cases. But to... They're not filed as part of the tariff? As part of the tariff? My understanding is that it's not incorporated into the tariff. But to Petitioner's point about the facility study agreement, I'd note first that I think that argument was waived. It wasn't raised on re-hearing to the Commission. And even if it's not considered waived, I think the Court clearly had it before it the first time around and found it unpersuasive and rejected essentially the same argument that Petitioners are now making with regard to that facility study agreement. They've tried to make additional arguments about certain facts pertaining to that study agreement, like the person who signed it was involved in the other tariff proceeding that adopted the new tariff. I would note that that wasn't raised to the Commission. It was raised... That particular point about the signatory was raised for the first time in the reply brief. So to the extent that may be material, the Commission hasn't had a chance to opine on it. Do you have a view on their argument about the meaning of Section 219 in the new tariff? Yeah, I think our position is that it's improperly before the Court. Everyone in the first iteration of this case, everyone assumed that the Commission's interpretation was pretty clear. It would have made no sense for Wes Depard, now intervener in this case, to push the arguments that it was making if the Commission's interpretation was otherwise because it would have... Well, let's just say it was an open question, and there was no need to deal with it until the decision of Wes Depard vacating the initial Commission decision and remanding. Their argument is there was no point to deal with it then. There may have been more to be litigated, more litigation risk for both sides to confront, but it just didn't make sense to address that issue until it looked like there was at least a reasonable prospect of being governed by the new tariff. And so isn't that a fair understanding of how remands work, in that you get to raise new issues that are implicated by the scope of the remand? I think in this case, no, Your Honor, because had this potential interpretation been contemplated the first time around, Wes Depard would have needed to defend itself against that because otherwise it would have been on the hook for these costs, regardless of which version of the tariff applied. Well, I don't know that we can determine the scope of a waiver by just the argument that someone else would have argued something differently, right? I'm asking you structurally about the nature of a remand. Isn't it true that when there's a remand, parties are free to raise issues that weren't raised before because new things are now in play in light of the remand? I think that's fair, Your Honor, and I think that's consistent with the radio television opinion saying the Commission has discretion to open the hole that's proceeding on a remand. And I think the more important point here is that despite the fact that this may have been improperly raised on remand, the Commission went to great lengths to try and clarify its interpretation and explain why it was interpreting the tariff in the way that it was. They say the whole system won't work if you interpret the new tariff this way, that it won't work because people won't be able to plan properly, there won't be stability. What is your response to that, or the Commission's response to that? There wasn't a whole lot of that in their actual opinion. The Commission's response to that is that it hasn't been shown to be true. It's at best speculative. Their concern about delay is counteracted by strict timelines that PJM has for these types of agreements and requiring signings by certain dates, also bolstered by the fact that PJM rarely changes these types of cost allocation provisions in its tariff. And the Commission also noted in a footnote, I believe it was JA021, note 36, the Commission noted that delay is equally possible under the petitioner's interpretation of the tariff because there's nothing stopping an interconnection customer from delaying its entering the queue or signing these agreements. That delay is equally possible in that context, and there's no strict timeline governing that, so no protection that the Commission identified that exists with regard to the actual filing of the agreement. Thank you very much. Your Honors, may it please the Court. Ashley Parrish for West Deptford. What I'd like to do, Judge Millett, is answer one of your questions, and then I'd just briefly discuss three threshold problems with each of the three arguments. Judge Millett, you had asked whether the transmittal letter or the order accepting it could be binding or not. There is a case, Louisiana Gas at 137 FERC, Paragraph 61-195 at Paragraph 54, that says applicants owe ATT provisions rather than the statements in the transmittal letter are binding on the applicants. And so the Commission has always said in the context of the file rate doctrine that although these other documents may have meaning, they're not binding the tariff controls. That takes me to really the three what I think are legal threshold problems with their arguments. First, they have no legal theory as to when you are allowed to consider extrinsic evidence outside the tariff itself. They just assume on the idea that if there is extrinsic evidence, they can point to it and then create ambiguity in the document, but they point to nothing in the tariff itself that is ambiguous. Second, they have no legal theory in response to the Court's questions in its first opinion as to what type of notice would be legally adequate. The whole point of the file rate doctrine, if you think of the old common carriers, is that you could go to a railroad and say, I don't care what you're telling me right now, the price is, the file rate said it's $5 to take me from New York to Seattle, and I want that $5 rate, and the file rate doctrine would apply, regardless of what the common carrier wants to do in terms of discriminating in any particular case. And third, I don't think they have an answer to the waiver. Judge Millett, to your question, I think that the rule of sort of judicial procedure is a little bit more narrow than you described it in the sense that you're allowed to raise new arguments on remand, but they have to be implicated by the Court's decision. This particular case was always litigated on the premise that if 37, the superseded tariff controlled, then West Dufford would lose, and that if the Section 219 tariff controlled, we would win. And that premise could have been challenged as an argument in the alternative in the proceedings before FERC or in this appeal, and it wasn't. Therefore, it's waived. Was it determined by FERC previously that that's what it meant, or was it just assumed by the parties for purposes of prior proceedings? The way I would say is it was not determined by FERC, but it was presented by the parties that that was the dispute to be resolved. They could have easily raised an alternative grounds for basically affirmance, and they did not raise that. In fact, the whole litigation proceeded on this. That sounds more like an estoppel argument than a waiver argument. Your Honor, I think Judge Starr's opinion in this Court's Northwest Indiana case sort of treats it like that, which is to say for purposes of judicial procedure, we can't let someone keep an argument and wait. And then it's true, if the Court's decision opens it up, then you can re-raise it. You can't just raise something that you forfeited before. We'd urge the Court to go ahead and affirm the commission. Thank you for your time. Thank you. Mr. Eisenstat, we'll give you two more minutes. First, with respect to what the Court has done with respect to these types of cases, I refer you to Public Utilities Commission 988 F. 2nd 154 at 163. With respect to the Court inquires as a practical matter what's being said. The Court's looking for context. You have to look at these kinds of filings in the context of what's being said, how they are understood, the totality of the circumstances. That's what the Courts have routinely done. That's what FERC has done. Is that case in your brief? I'm sorry? Is that case in your brief? Yes, the totality of the circumstances, ma'am, is in the brief. Totality of evidence, totality of circumstances. I believe Public Utilities Commission is in the brief. Okay. I should also mention that there is a FERC order, as in Louisiana. The FERC order is 122 FERC 61069, where the commission on paragraphs 13 and 14, actually it's paragraphs 50, 51, where the commission says, however, although we are not finding that ICE in New England violated a particular section, and they're referring to in this case about whether it's retroactive rate making, do not violate the section in order to prevent future similar misunderstandings. We expect ICE in New England to amend the language at issue so that the tariff on file is consistent with ICE in New England's earlier actions. They talk about the transmittal letter in that same paragraph, and in the next paragraph they say, this language clearly signals that notwithstanding the omission of words to that effect in the version of section, it's a long section, which ICE in New England actually submitted to the commission, ICE in New England intended to include existing units in its overlapping impact tests, et cetera. With respect to the letter order, the commission did not address the letter order. FERC did not present the letter order. In fact, on oral argument before this court, it was observed that the letter order was basically nowhere to appear, that FERC relied on the transmittal letter and on PJM's answer. That's what it relied on, and it never put everything together. With respect to that letter order, and not saying anything about earlier cues, the whole point was how this was to work. The reason why it said starting with the U2Q, the reason it said that is because the U2Q cue closed August 31. That means it was going to be studied pursuant to the new procedures as of August 1. That's what it means, and that's why FERC said, excuse me, that's why PJM said at page 2 of the transmittal letter, that that date, this effective date, is necessary to allow the proposed changes to become effective with the date of the next open cue. So the studies that are going to be done are going to be done post-August 1. That's the idea, and that's what FERC said in its answer. Thank you very much. I don't know if I have your time. Okay. Thank you.
judges: Millett, Wilkins, Edwards